## BLAUVELT *vs.* ACKERMAN and others.

1. Though a bill may be dismissed for want of equity, the court will not make such an order without argument and examination, though the master may, from his view of the evidence, recommend in his report that course to be taken.

2. A trustee cannot, either directly or indirectly, become the purchaser of property held by himself in trust, at or by means of his own sale. The property after such sale remains, as before, vested in the trustee.

3. If a trustee exchanges trust property for other real estate, and takes the title thereto in his own name, such property so acquired will be con sidered trust property to the extent of the value of the trust property exchanged therefor. And if no deed has been made by the trustee, and the trust property is afterwards forfeited and given back for breach of conditions, to the trustee, that will enure to the benefit of the trust fund, not of the trustee.

4. If a trustee deals with trust property as his own, he takes upon himself all the risk and responsibility, without the right or prospect of personal benefit, for he must be liable for the value of the trust property and all that is gained by it.

5. Where the master's report is in a great measure based on erroneous views with regard to some important matters referred to him, it will be referred anew, so that the report may be in conformity with the views of the court.

*Mr. Ransom,* for complainant.

*Mr. Gilchrist,* for defendants.

This cause was argued before the Hon. J. F. Randolph, one of the masters of the court, sitting for the Chancellor.

THE MASTER. The complainant in this case, finding himself somewhat embarrassed with debts and law suits against him, on the 28th of September, A. D., 1848, made a special assignment for the benefit of his creditors, under the laws of the state of New York, where he then resided, to John Ackerman, jun., then of Bergen county, in this state. The whole of his debts named in the assignment and schedule amounted to a little over $2000, the largest being $993.83 due the assignee; and the debts due complainant are set down in the schedule

at $1975 (including a claim of $1750 against Joseph Swift) ; also half the interest in a certain tract of land in James City county, Virginia, known as the Russell tract. The debts and assets, though seemingly of rather a small amount, appear to have given rise to much litigation. The present suit was commenced in 1867 by the complainant, against the legal representatives of John Ackerman, jun., deceased, he having previously departed this life. A large amount of evidence having been taken, and this court, without considering the same or any question thereon, being of opinion that the complainant was entitled to have an account of the moneys which came to the hands of the said defendants from the estate of the said John Ackerman, jun., deceased, and of the property of which he died seized, both real and personal, and also to have an account taken of all moneys justly and equitably due the complainant from the estate of the said John Ackerman, jun., deceased, and from the defendants, at the term of July, 1864, by a decretal order referred the same to one of the masters of this court to take an account of the moneys, property, real and personal, and other assets of the said John Ackerman, jun., deceased, which had come to the defendants, or either of them, or any other person for them ; and also an account of all moneys legally or equitably due complainant from the estate of said Ackerman ; and also of the rents, issues, and profits of the houses and lots described in complainant's bill, situate in Tenth avenue, New York city, received by said Ackerman in his life time, and by the defendants since his death ; and also to inquire and state to the court the value of said houses and lots ; and also to take an account of all the property, real and personal, located in James City county, in the state of Virginia, described and named in the bill, which came to the possession of said Ackerman and said defendants, by sale of any portion thereof, and the amount and value of the rents, issues, and profits thereof, that accrued or came to the said Ackerman or the said defendants ; and also of all moneys received from said property, by sale or otherwise, by said defendants ; and also to inquire

and state to the court the value of said real estate situate in James City county aforesaid, and the amount of money received by the defendants for the same ; and also an account of the posts, rails, wood, timber, coal, and other property, cut and taken from said James City property by said Ackerman and the defendants ; the master to make all just allowances for moneys legally and properly paid by said Ackerman and said defendants. A large additional amount of evidence was taken before the master, and on the coming in of the report, in June, 1868, the complainant filed a number of exceptions to the same, and the case comes now before the court on the hearing of those exceptions.

A preliminary question was raised by defendants' counsel, that inasmuch as the order of reference did not decree the complainant was entitled to relief, but simply that he was entitled to an account, and that as the master had reported generally against the claim of the complainant, and that the bill should be dismissed for want of equity, the case was brought back to this court in the same position it would have been in had the question been originally argued on bill, answer, and evidence, and the court were of the opinion that the equity of the bill was not sustained, and that the bill should be dismissed accordingly. No doubt but the court may, on such hearing, dismiss the bill for want of equity sustained by proof, as was done after argument in the case of *Campbell* v. *Zabriskie*, 4 *Halst. C. R.* 356, which was sustained by the Court of Appeals, *Ibid.* 738. But in the cause before us, no argument was had prior to the interlocutory decree, the clause of being entitled to relief was merely struck out, and the order made was a simple reference for account, thus reserving the whole equity until the coming in of the report. And although the master reports his conclusion upon the evidence generally as adverse to the complainant, and recommends that the bill be dismissed for want of equity, yet as neither of these subjects appears to have been referred to the master, or constituted a proper subject of reference, the court must be governed by its own opinion, from the evidence.

The principal difficulties have grown out of two items in the credit side of complainant's schedule, *viz.* Joseph Swift is set down as a debtor for $1750, and there is also stated as assets " half interest in a certain tract of land in James City county, Virginia, known as Russell's tract, and now worked by Joseph Swift, above named." This tract was purchased by the complainant of Peter Relyea, in January, 1846, for about $3000, in real estate situated in New Jersey.

In 1842, it had been sold by order of the court in James City county, Virginia, at vendue, for $700, to Henry P. Banks, and by him transferred to Relyea for $1200, of which $950 had been paid by him when complainant purchased. By the terms of sale under the order of the court, the deed was not to be made to the purchaser or his assigns until the purchase money was paid, and the last payment, being the balance of the purchase money, was not paid by complainant, as assignee of Relyea, till December 12th, 1848, about three months after his assignment; prior to which, complainant had sold, but not transferred, one half of his interest to Joseph Swift, who formed a sort of partnership with him; and it is for this half that complainant puts down his claim against Swift at $1750, as the consideration therefor, no part of it having been then paid.

In the winter of 1848, Swift's claims were bought out by Ackerman for $550, and a boat load of coal. Swift had expended some money on the property whilst he was in connection with Blauvelt, but as the latter had paid for the whole property, and Swift had never paid for any portion of his half to Blauvelt, or had any right assigned to him, the money paid him by Ackerman was rather to reimburse him for his expenditures, and to get clear of him and his claim, than for his interest in the property, which never, in fact, passed from Blauvelt to Swift. This being the case, Ackerman, as assignee of Blauvelt, had no right to pay Swift as a debt $550 in cash, when he (Swift) owed to Ackerman, as assignee of Blauvelt, $1750 for the very half of the property he was selling to Ackerman for cash, unless by way of com-

promise. An assignee would have no right so to deal with the rights of the assignor and his creditors. I consider then that after Swift was paid, and abandoned whatever interest he had in the property, it obliterated Blauvelt's debt of $1750, and Swift's prior right in one half the property became vested as part of Blauvelt's assets, in his assignee, for the benefit of the creditors. The amount paid to Swift by way of compromise will of course be a proper credit for the assignee.

Swift was in the first place secured his $550 by a note and agreement for that amount signed by Blauvelt and John Ackerman, jun., assignee, dated December 14th, 1848, which note was afterwards paid by Ackerman. On the 29th of December, 1849, a deed for the Russell property was made pursuant to the decree of the court of James City county, by Barlow and Hankins, commissioners, to John Ackerman, jun., reciting the various assignments by Banks to Relyea and by him to Blauvelt and by him to Ackerman, and that the consideration for the same had been fully paid in each case. Prior to this deed, *viz.* on the 16th day of June, 1849, the property had been sold by Ackerman pursuant to advertisement, at the hotel of Peter Archdeacon, in Paterson. Only three or four persons being present, there was but one bid, and that by Archdeacon, for $1650, and the property was sold to him according to prior understanding, and the property or bid was by him, on the same day, assigned or transferred to Ackerman, for $25 paid him by Ackerman; and this sale the master reports as having extinguished the trust in Ackerman, and vested the property in him free from any trust or encumbrance. The object of this sale was manifest. No deed had as yet been obtained from the Virginia court and commissioners, and the only title which Blauvelt and his assignee had was a mere assignment of the bid and the striking off the property to Banks, assigned by him to Relyea, and by him to Blauvelt. And as a question might arise in the Virginia court whether that and the assignment of Blauvelt as an insolvent debtor to Ackerman

would be considered sufficient to enable either Blauvelt or his assignee to claim a deed from the commissioners, or to make a title without it, Mr. Wadsworth, the counsel for Blauvelt and his assignee, advised the sale, and stated that it was for the benefit of Blauvelt and his creditors; and the affidavit of Blauvelt, made in New York before a Virginia commissioner, and his testimony, as well as the fact that Ackerman never charged himself with $1650, go to show that both Blauvelt and Ackerman took the same view of the sale.

It can hardly be supposed that Mr. Ackerman intended in this way to have the property fraudulently conveyed to him for his individual benefit, or that such a conveyance for such a purpose could be sanctioned by any court, either of law or equity. It is of no consequence whether Mr. Ackerman or any other persons may or may not have had views looking to Ackerman's becoming the owner of this property for himself, for the purpose of speculation or otherwise; the sale was illegal, fraudulent, and void. A trustee cannot, either directly or indirectly, become the purchaser of property held by himself in trust, at or by means of his own sale. Executors, administrators, guardians, or trustees, can never sell real estate to themselves either directly and openly, or secretly and covertly, through another person employed for the purpose. Every such sale is void. *Den d. Obert* v. *Hammell*, 3 *Harr.* 73; *Winter* v. *Geroe*, 1 *Halst. C. R.* 319; *Hill on Trustees* 158–9 and 535; *Scott* v. *Gamble*, 1 *Stockt.* 218; *Ib.* 797.

The property, after the sale, remained as before, vested in Ackerman as assignee of Blauvelt for the benefit of his creditors, and could only be used or sold for that purpose.

It appears by the evidence that on the 28th of December, 1849, Ackerman entered into a written agreement with Philip Schuyler of New York city, to sell him the Russell tract of land, with the stock and utensils thereon, for the sum of $3200, of which sum $2239.17 " being now paid by conveyance of certain property in the city of New York, as

stated in said agreement," the balance of $969.31 to be se-cured by Schuyler by bond·and mortgage, payable before or at the expiration of three years, with six per cent. interest; the conveyance of the Virginia property to be made to Schuyler on or before August 11th, 1850. On the day of the agreement, December 28th, 1849, Schuyler and wife conveyed by warrantee deed to Ackerman, " in consideration of $4000, the lot of land and premises on the east side of Tenth avenue, New York, and about twenty-five feet south-erly from the southeast corner of Tenth avenue and twenty-seventh street," subject to a mortgage for $2000 to Peter P. Ramsey, and another mortgage for $400 to H. A. Lenox, both of which were assumed by Ackerman as part of the consideration for the property. This deed is dated Decem-ber 27th, 1849, but as the agreement bears date December 28th, and both instruments were executed before the same subscribing witness, who also, as a commissioner, took the acknowledgment of the deed on the 28th of December, it is but reasonable to conclude that the deed was executed on that day. Shortly after this date Schuyler went to Virginia and took possession of Russell's tract, with the stock and uten-sils thereon, according to the agreement. Difficulties after-wards arose as to the New York property, and judgments were found open against it; these were adjusted; and on the 26th of March, 1850, Schuyler endorsed on the original agreement, an agreement that $200.32 were to be added to the sum of $960.83, making it equal to $1161.15, for which Schuyler was to give a mortgage. Both parties being in possession, respectively, of the exchanged properties, and Schuyler not complying with the terms of his agreement, either by giving the mortgage or paying the interest, and Ackerman having paid off the $2000 mortgage on the New York property, in the fall of 1853, (nothing further appear-ing to be proved in regard to the $400 mortgage,) Schuyler came to New York and agreed to give up the Virginia prop-erty. The witness says: " Schuyler did not comply with his agreement, and Mr. Ackerman had to take the place back;"

but he also retained the property conveyed to him in New York. As Ackerman got the New York property by an exchange of the Virginia property which he held in trust for Blauvelt and his creditors, so far as the trust property contributed to the purchase of the New York property, the latter must be considered as held in trust by Ackerman and his successors for Blauvelt and his creditors, to the amount of that contribution. And it must be so, notwithstanding that ultimately no part of the Virginia property, except the use of it from 1849 to 1853, actually contributed as part of the consideration or price to the purchase, in consequence of Schuyler's non-fulfilment of his agreement, and his giving up and abandoning the Virginia property, which was afterwards sold and conveyed by Ackerman to Whitaker for $2100. Schuyler never had a deed, and he did not abandon his interest in that trust property to Ackerman as an individual but as a trustee; otherwise Ackerman would stand in the position of a trustee, dealing and speculating with trust property, and making individual profit therefrom. This cannot be done. When a trustee deals with trust property as his own, he takes upon himself all the risk and responsibility, without the right or prospect of personal benefit; for he must be liable for the value of the trust property, and all that is gained by it. If a trustee exchanges trust property for other property of alleged equal value, and on the receipt thereof he sells it for, say $1000 more than the estimated value of either property, the $1000 does not go to the trustee but to the trust fund, and if on the receipt he sold it for $1000 less than the value, he must contribute the $1000 to the trust fund. A trustee has no right to deal with trust property as his own, and if he does, and profit arises therefrom, it goes to the fund and not to the trustee. *Hill on Trustees* 534–5. Trustees and their representatives are chargeable in equity, for a breach of trust, whether they derive benefit from it or not. Trustees are not entitled to benefit themselves from the use of trust property. *Green* v. *Winter,* 1 *Johns. C. R.* 27; *Parkist* v. *Alexander, Ib.* 394;

*Schieffelin* v. *Stewart, Ib.* 620; *Brown* v. *Rickets,* 4 *Johns. C. R.* 303; *Evertson* v. *Tappen,* 5 *Ib.* 497; *Hawley* v. *Mancius,* 7 *Ib.* 174; *Holridge* v. *Gillespie,* 2 *Ib.* 30; *Mathews* v. *Dragaud,* 3 *Des.* 25; *Trenton Bank* v. *Woodruff,* 1 *Green's C. R.* 117.

The Virginia property was agreed to be sold to Schuyler for $3200, and the consideration in the deed for the New York property was $4000, for which sum it was afterwards sold by the son and successor of Ackerman. Ackerman assumed and paid the $2000 and the interest and a judgment, amounting in all to $2105, and also some large amounts for repairs; whether the $400 mortgage had been previously paid off, or was subsequently paid off by Ackerman, does not appear. He also and his successor received some $3000 or more for rents of the New York property. The aggregate payments by Mr. Ackerman from his own funds, on the purchase money and on the encumbrances thereon, must be Mr. Ackerman's proportion of the $4000, for which the property was sold, and the residue of the said sum after deducting such payments must belong to the trust fund; and the net aggregate amount of the annual rents of the New York property included in the exchange, after deducting all necessary and proper expenses paid for putting and keeping said property in repair, payments for taxes, and ground rents if any, and any other proper and necessary expenses paid in respect to said property, should be the amount to be divided between the personal representatives of Ackerman, and the trust fund for Blauvelt and his creditors in the same proportions as the $4000 is directed to be divided. The amount for which the property was sold to Whitaker is also to be included in the trust fund; and also there should be added thereto any moneys which may be found due to the assignee from the sale of any wood, lumber, rails, charcoal, or other personal property, on the Russell property at the time of the assignment, or which was afterwards cut or manufactured thereon; and also the proceeds of any debts due to Blauvelt or his assignee, that came to the hands of

N *

the said assignee, or which might, with proper diligence, have come to his hands. Interest to be calculated on either side or not, as the master shall consider equitable and just.

Without particularly examining the numerous exceptions taken to the master's report, which report is in a great measure based on the master's views in regard to the Virginia and New York properties; and as there is no account whatever of the wood, timber, rails, charcoal, cattle, utensils, and other personal property on the Russell tract at the time of the assignment, or of which the assignee became possessed, I see no way of rectifying the matter but by again referring the same to a master to state an account in accordance with the views herein expressed, which is hereby accordingly recommended.